Gannaway v. Pena







NUMBER 13-99-426-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

 
GEOFFREY GANNAWAY, INDIVIDUALLY AND AS THE INDEPENDENT 

ADMINISTRATOR OF THE ESTATE OF JULIANA "JULIA" GANNAWAY, 

DECEASED, LOURIE A. GANNAWAY, III, INDIVIDUALLY, AND 

JOHN M. GANNAWAY, INDIVIDUALLY, Appellants,


v.



MATIAS PENA, JR., INDIVIDUALLY AND D/B/A PENA - FARMS, Appellee.



 
On appeal from the 92nd District Court of Hidalgo County, Texas.



 
O P I N I O N



Before Justices Hinojosa, Yañez, and Chavez (1)

Opinion by Justice Hinojosa


Appellants, Geoffrey Gannaway, individually and as the independent administrator of the Estate of Juliana "Julia"
Gannaway, Deceased, Lourie A. Gannaway, III, individually, and John M. Gannaway, individually (collectively "the
Gannaways"), (2) appeal from the trial court's judgment in favor of appellee, Matias Pena, Jr., individually and d/b/a
Pena-Farms. By five issues, the Gannaways contend: (1) the trial judge did not have authority to preside over this case; (2)
letters between Geoffrey and Pena did not constitute a legally binding contract for the sale of land; (3) the alleged
agreement is neither specific nor complete enough to be enforced by specific performance; (4) whether the parties intended
to be bound by the letters is a question of fact for the jury; and (5) the trial court erred in excluding evidence of a formal
earnest money contract. We affirm.

A. Background and Procedural History

Juliana Gannaway owned a 281 acre tract of land adjacent to U.S. Highway 281 near Edinburg. Beginning in 1982, Pena
farmed the land under various lease agreements with Juliana. As Juliana became unable to handle her own affairs, her
daughter-in-law, Dorothea Gannaway, was given power of attorney in September 1980. Dorothea died on December 25,
1991, and Geoffrey was appointed Juliana's guardian. Juliana died on March 6, 1993. On March 29, 1993, the probate
court determined that Juliana had died intestate. Geoffrey was appointed administrator of the estate on April 28, 1993. In
May 1993, Lourie's daughter filed a "Motion to Produce Will and Show Cause," asserting that Geoffrey and Lourie had a
copy of Juliana's valid, unrevoked will which they had failed to produce to the probate court. The motion claimed that this
1977 will provided for a trust and provisions for Juliana's great-grandchildren. (3)

In August 1994, Geoffrey discovered a will executed by Juliana in 1966. The will left all her property to Lourie A.
Gannaway, Jr., Juliana's son, (4) who died in 1968. In September 1994, the 1966 will was admitted to probate. 

On September 21, 1996, Pena met with Geoffrey and expressed a desire to purchase the 281 acres. Pena proposed paying
$300,000.00 for the land by August 1997. This amount would be paid in the following manner: (1) a down payment of
$50,000.00 in December 1996, (2) $175,000.00 when he sold some land, and (3) $75,000.00 in bank financing. After
discussing the offer with Lourie and John, Geoffrey wrote a letter to Pena on October 22,1996, accepting Pena's offer to
purchase the land. (5) On October 29, 1996, Pena wrote to confirm that he was accepting the terms and conditions agreed
upon. In November 1996, Geoffrey learned that land near this property had sold for a substantial sum more than Pena had
offered. (6) In December 1996, Geoffrey met with Pena and expressed concern that Pena's offer was not a fair price.
Geoffrey asked that Pena rescind his offer, but Pena refused. Pena did, however, offer to pay a down payment of
$100,000.00, instead of $50,000.00. After speaking with his accountant concerning the estate tax consequences of a larger
down payment, Geoffrey rejected the larger down payment.

Pena did not make the $50,000.00 down payment in December 1996. Pena then called Geoffrey on January 25, 1997, to let
him know that he had a contract ready for them to sign. Geoffrey informed Pena that since he had not received the down
payment, he assumed that Pena had rescinded his offer and that the offer was null and void. Pena claimed that Geoffrey
had given him an extension until January 1997 for the down payment. On February 6, 1997, Geoffrey sent Pena a letter
confirming that he considered the proposal null and void because he did not receive a down payment or contract in
December 1996. He further stated that they still intended to sell the land but wanted to further investigate the current
market.

On January 27, 1997, Pena's attorney sent a letter to Sandra Mann, the attorney who handled the probate of Juliana's estate,
demanding that the Gannaways comply with the terms of the agreement. The letter references the cloud on the title created
by the great grandchild's motion in the probate court, and further states that 

Pena has at all times been ready, willing and able to close based on that agreement but for [the cloud on the estate]. Mr.
Gannaway and Mr. Pena agreed in a phone conversation, in the later [sic] part of December, that due to the title problem
the sale could close in December or January. If closed in January, he would want $100,000.00 down. Mr. Pena agreed. . . .
My client feels that your client was and has been fully aware of the claim made by his niece, and that this matter was not
disclosed to him at the time of the agreement. The delay in closing this deal has never been due to any act or omission on
the part of Mr. Pena.

On April 27, 1997, the Gannaways filed suit against Pena seeking a declaration that the negotiations did not constitute a
legally binding contract, and later amended to include a claim for fraud. Pena counterclaimed for breach of contract, fraud,
and civil conspiracy. The trial court granted instructed verdicts on the fraud and conspiracy claims and ruled as a matter of
law that the letters between Geoffrey and Pena constituted a legally binding contract. The jury then determined that Pena
had breached the agreement, but his breach was excused because compliance was waived by the Gannaways. The trial
court entered a judgment ordering specific performance of the contract and awarded Pena $120,000.00 in attorneys' fees.

B. Assignment of A Visiting Judge

In their first issue, the Gannaways complain that Judge Homer Salinas did not have authority to preside over this case. The
Gannaways contend that Judge Salinas is not "an elected judge nor is he a retired judge; he is a former judge," and a former
judge has no authority to hear a case absent an order of assignment from the presiding judge of the administrative district
and the presiding judge did not assign Judge Salinas to this case or to the 92nd District Court of Hidalgo County, Texas for
the period of time during which this case was heard. They further contend that the "explicit conditions in the orders
assigning Judge Salinas to jail and criminal cases preclude any kind derivative [sic] authority for this case."

A judge assigned under the provisions of the Texas Court Administration Act has all the powers of the judge of the court to
which he is assigned. Tex. Gov't Code Ann. § 74.059 (Vernon 1998); Mendoza v. Fleming, 41 S.W.3d 781, 784 (Tex.
App.-Corpus Christi 2001, no pet.). Furthermore, 

In any county in which there are two or more district courts, the judges of those courts, may, in their discretion, either in
termtime or vacation, on motion of any party or on agreement of the parties, or on their own motion, transfer any civil or
criminal case or proceeding on their dockets to the docket of one of those other district courts. The judges of those courts
may, in their discretion, exchange benches or districts from time to time.

Tex. Gov't Code Ann. § 24.303 (Vernon 1988). This provision is derived from the Texas Constitution, which provides that
"District Judges may exchange districts, or hold courts for each other when they may deem it expedient, and shall do so
when required by law." Tex. Const. art. V, § 11. These statutes and rules generally rely on the principle of judicial
restraint to prevent district courts within the same county from fighting one another for jurisdiction over a case. Excel
Corp. v. Valdez, 921 S.W.2d 444, 448 (Tex. App.-Corpus Christi 1996, orig. proceeding [leave granted, mand. denied]).
The trial court has discretion to decide when to transfer a case to another district, and a litigant does not have a protected,
proprietary interest in having his case heard by a particular judge or in a particular court. Id. at 447; European Crossroads'
Shopping Ctr., Ltd. v. Criswell, 910 S.W.2d 45, 51 (Tex. App.-Dallas 1995, writ denied).

Texas courts have interpreted these provisions as allowing a judge properly assigned to one district court to preside in other
district courts of the same county. See Peach v. State, 498 S.W.2d 192, 194 (Tex. Crim. App. 1973), overruled on other
grounds, Jackson v. State, 548 S.W.2d 685 (Tex. Crim. App. 1977); Mendoza, 41 S.W.3d at 785;Ex parte
Dharmagunaratne, 950 S.W.2d 140, 142 (Tex. App.-Fort Worth 1997, pet. ref'd). Furthermore, a judge sitting by
assignment may preside over a court regardless of whether the regular district judge of that court was present and trying
another case at the same time. Hughes v. State, 897 S.W.2d 285, 306 (Tex. Crim. App. 1994); Mendoza, 41 S.W.3d at 785.

The Gannaways contend that Judge Salinas was not properly appointed to this case because there was no order of
appointment by the presiding judge of the administrative district appointing Judge Salinas to any court other than the
Hidalgo County Jail Court or the Criminal Auxiliary Court. We take judicial notice that Judge Salinas is a duly designated
senior judge, having retired as a district judge and having timely elected to be a judicial officer. (7) See Herrod v. State, 650
S.W.2d 814, 817 (Tex. Crim. App. 1983);Buchanan v. State, 471 S.W.2d 401, 404 (Tex. Crim. App. 1971). A retired
judge sitting by administrative assignment possesses all powers of the court to which the judge is assigned. Alexander v.
State, 903 S.W.2d 881, 883 (Tex. App.-Fort Worth 1995, pet. ref'd). No formal order of appointment is necessary for the
judge of one district court to preside over a case in the place of the elected judge. Buchanan, 471 S.W.2d at 404. A retired
judge who has properly filed and elected to continue to serve as a judicial officer is a district judge in this sense, and no
formal order of appointment is necessary for the retired judge to preside over a case in the stead of an elected
judge.Id.Absent a showing to the contrary, it is presumed the assignment of a retired judge was properly made. Id.

Neither party sought to supplement the record with an order of assignment. Pursuant to rule 34.5(c) of the rules of appellate
procedure, this Court asked the District Clerk of Hidalgo County to supplement the clerk's record with documentation, if
any, of Judge Salinas's assignment. The district clerk supplemented the record with a copy of two assignment orders, the
first signed on February 19, 1999, and the second on March 24, 1999 by Darell Hester, Presiding Judge of the Fifth
Administrative Judicial Region.

Judge Hester's orders provide in relevant part as follows:

Pursuant to Section 74.056, Texas Government Code,

I hereby assign the 




Honorable Homer Salinas



Senior Judge of the 92nd District Court

 

To the 275th District Court of Hidalgo County, Texas




This assignment is for the period beginning March 1, 1999, and ending April 2, 1999, (8) provided that it shall continue
thereafter so long as may be necessary for the assigned judge to complete trial of any cause begun during such period, and
to pass on motions for new trial and all other matters growing out of any cause heard by the assigned judge during such
period.

 

CONDITION(S) OF ASSIGNMENT (IF ANY):

 

To preside over the Hidalgo County Jail Court.




The Gannaways cite In re Nash, 13 S.W.3d 894 (Tex. App.-Beaumont 1999, no pet.), for the proposition that the
assignment orders provide that Salinas is to preside over the Hidalgo County Jail Court, and the instant case is not a jail
case; thus, it does not fall within the scope of the assignment order. In Nash, the conditions of assignment in the
assignment order provided "October 1 - November 30, 1999 Tax Dockets." Id. at 898. The court found that:

the subject matter of the assignment is "tax dockets." Clearly, the instant case is not a tax case, and, thus, does not fall
within the scope of the assignment order. . . . Because the assignment was expressly restricted to "tax dockets," it was not
effective to give him authority to make any orders in a suit alleging trespass and conversion and involving title to real property.

Id. at 898-99. 

We note that under condition of assignment, the order states "Hidalgo County Jail Court." However, we do not find that
the condition of assignment in this case is analogous to the condition in Nash. In Nash, the judge was assigned to only hear
particular cases. In the instant case, Judge Salinas was assigned to an auxiliary court. Assigning a judge to an auxiliary
court does not limit the judge's ability to hear a specific case.

While we recognize that the jail court was established to give preference to jail cases, the jail court is an extension of the
district courts in the county and the judge sitting in the jail court is not prohibited from hearing other cases. Cf. Ex parte
Dharmagunaratne, 950 S.W.2d at 142-43 ("on the basis that properly assigned judges may sit for other judges within the
county, we hold that Judge Walker was properly authorized, pursuant to his administrative assignment, to preside over
appellants' cases in the 297th District Court, regardless of whether the place of the trial was designated as Trial Court C").
Accordingly, we hold that Judge Homer Salinas had authority to preside over this case in place of the elected judge,
Edward Aparicio. The Gannaways' first issue is overruled.

C. Statute of Frauds

In their second issue, the Gannaways contend the letters between Geoffrey and Pena do not constitute a legally binding
contract for the sale of land because they do not satisfy the statute of frauds. They argue that the writings at issue do not
satisfy the statute of frauds because they do not state with certainty all of the essential terms of a contract. Parties enter into
a binding contract when the following elements exist: (1) an offer; (2) an acceptance in strict compliance with the terms of
the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract
with the intent that it be mutual and binding. Copeland v. Alsobrook, 3 S.W.3d 598, 604 (Tex. App.-San Antonio 1999,
pet. denied) (citations omitted). The determination of a meeting of the minds, and thus offer and acceptance, is based on
the objective standard of what the parties said and did, and not on their subjective state of mind. Id. Additionally,
consideration is a fundamental element of any valid contract. Smith v. Renz, 840 S.W.2d 702, 704 (Tex. App.-Corpus
Christi 1992, writ denied).

It is not enough that one party thinks there was a contract; they must show that their intentions to contract were expressed
in a manner that the court is capable of understanding. See Williford Energy Co. v. Submergible Cable Servs., 895 S.W.2d
379, 384 (Tex. App.-Amarillo 1994, no writ). Where the fact finder determines that one party reasonably drew the
inference of a promise from the other party's conduct, that promise will be given effect in law. Id. 

To create an enforceable contract, the minds of the parties must meet with respect to the subject matter of the agreement
and all its essential terms. Weynand v. Weynand, 990 S.W.2d 843, 846 (Tex. App.-Dallas 1999, pet. denied). An
acceptance must not change the terms of an offer; if it does, the offer is rejected. United Concrete Pipe Corp. v. Spin-Line
Co., 430 S.W.2d 360, 364 (Tex. 1968). A material change in a proposed contract constitutes a counteroffer, which must be
accepted by the other party for a contract to exist. Antonini v. Harris County Appraisal Dist., 999 S.W.2d 608, 611 (Tex.
App.-Houston [14th Dist.] 1999, no pet.). 

The statute of frauds states, in pertinent part, that a contract for the sale of real estate "is not enforceable unless the promise
or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or
agreement or by someone lawfully authorized to sign for him." Tex. Bus. & Com. Code Ann. § 26.01 (Vernon 1987). In
addition, the writing must adequately describe the property, and the written description must give an amount of information
to identify the property with reasonable certainty. Jones v. Kelley, 614 S.W.2d 95, 99 (Tex. 1981); Elizondo v. Gomez, 957
S.W.2d 862, 864 (Tex. App.-San Antonio 1997, pet. denied). Whether a contract falls within the statute of frauds is a
question of law. Bratcher v. Dozier, 162 Tex. 319, 346 S.W.2d 795, 796 (1961); Choi v. McKenzie, 975 S.W.2d 740, 742
(Tex. App.-Corpus Christi 1998, pet. denied). An agreement to make a future contract is enforceable only if it is specific as
to all essential terms, and no terms of the proposed agreement may be left to future negotiations. Fort Worth Indep. Sch.
Dist. v. City of Fort Worth, 22 S.W.3d 831, 846 (Tex. 2000) (citing Foster v. Wagner, 343 S.W.2d 914, 920-21 (Tex. Civ.
App.-El Paso 1961, writ ref'd n.r.e.)). It is well settled law that when an agreement leaves material matters open for future
adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to
agree.Id. 

Parol evidence may be used to explain or clarify the written agreement, but not to supply the essential terms. Tex. Builders
v. Keller, 928 S.W.2d 479, 481-82 (Tex. 1996); Morrow v. Shotwell, 477 S.W.2d 538, 541 (Tex. 1972). Each contract
should be considered separately to determine its material terms. T.O. Stanley Boot Co., Inc. v. Bank of El Paso, 847
S.W.2d 218, 221 (Tex. 1992) (citing Bridewell v. Pritchett, 562 S.W.2d 956, 958 (Tex. Civ. App.-Fort Worth 1978, writ
ref'd n.r.e.)). In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can
understand what the promisor undertook. T.O. Stanley Boot Co., 847 S.W.2d at 221. The material terms of the contract
must be agreed upon before a court can enforce the contract. Id. Where an essential term is open for future negotiation,
there is no binding contract. Id. (citing Gerdes v. Mustang Exploration Co., 666 S.W.2d 640, 644 (Tex. App.-Corpus
Christi 1984, no writ)). 

The following are the letters at issue in this case:

 

 

 

 

 


 Pena's handwritten note when he met Geoffrey Gannaway in Rivera on September 21, 1996 (included with the note was
a sketch of the land):


 50,000 Down paymt. Dec. 96

175,000 Land Sale

 75,000 Bank Finance 

300,000 Total Amt. By Aug. 97

 

 

 

 

 


 Letter of October 22, 1996, from Geoffrey Gannaway to Matias Pena, Jr.:


Estate of Julia Gannaway

c/o Geoffrey M. Gannaway

Independent Administrator

349 Palmetto

Corpus Christi, Texas 78412



October 22, 1996

Mr. Matias Pena

Route 3, Box 64

Edinburg, Texas 78539



Dear Matias,

I pray this letter finds you and your family in the best of health. Carol and I enjoyed our visit with you in Rivera last month.
I have discussed your offer with Lourie and John and we have agreed to accept your offer for: Lots 1 through 10, Block 43;
Lots 1 through 10, Block 49; Lots 4 through 7, Block 57; and Lots 1 through 5, Block 58, Citrus Fruit Development
Company, Hidalgo County, Texas. Property Address: U.S. Highway 281, 6 miles north of Edinburg, Texas 78539.

This letter is to confirm the terms of your offer of $300,000 to be paid in full by August 1997 in the following increments:

1. $50,000 as down payment, not later than December 1996; 

2. $175,000 to be paid upon closure of pending land sale (as discussed); and,

3. $75,000 to be financed not later than August 1997.

We desire to not transfer the mineral rights under this agreement. Please advise me in writing within 10 days of receipt of
this letter of your acceptance of these terms and conditions.

Sincerely yours,



/s/ 

Geoffrey M. Gannaway

 

 

 

 

 


 Letter of October 29, 1996, from Matias Pena, Jr. to Geoffrey Gannaway:



October 29, 1996

Mr. Geoffrey M. Gannaway

349 Palmetto

Corpus Christi, Tx. 78412

Dear Geoffrey,

This letter is to confirm that I have accepted the terms and conditions that we have agreed upon the purchase of said land 6
miles north of Edinburg on Highway 281. Geoffrey, it is a great pleasure doing business with you and your brothers, as it
was, for a long time, doing business with your great mother. I am sure that she would be very happy to know that I am
buying this land after farming it for so many years.

I also want you and your brothers to know that anytime you feel like you want to come out to walk or spend a day on this
farmland, do so as if it were yours. May God Bless you and all your family.

Sincerely,



/s/ 

Matias Pena, Jr.



The Gannaways contend that the following essential contract terms were omitted from the writings: (1) the date of closing;
(2) the date of possession; (3) the date of deferred payments; (4) whether financing will be through the seller or a third
party; (5) the interest rate; (6) the type and amount of security to be given on the deferred payments; (7) the time to convey
the deed; (8) the type of deed; (9) whether title insurance is required; and (10) which party is responsible for taxes.

In Moore v. Dilworth, 142 Tex. 538, 179 S.W.2d 940, 942 (1944), the Texas Supreme Court said:

It is essential to the validity of a contract that it be sufficiently certain to define the nature and extent of its obligations. If
an agreement is so indefinite as to make it impossible for a court to fix the legal liability of the parties thereto, it cannot
constitute an enforceable contract.

See also O'Neill v. Powell, 470 S.W.2d 775, 778 (Tex. App.-Fort Worth 1971, writ ref'd n.r.e.). In general, a contract is
legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations. T.O.
Stanley Boot, 847 S.W.2d at 221. The rules regarding indefiniteness of material terms of a contract are based on the
concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably
certain.Tex. Oil Co. v. Tenneco, Inc., 917 S.W.2d 826, 830 (Tex. App.-Houston [14th Dist.] 1994), rev'd on other grounds,
958 S.W.2d 178 (Tex. 1997). 

After reviewing the writings and the record, we conclude that the essential terms of the contract, as expressed in the letters
between Geoffrey and Pena, are sufficiently definite. The "essential terms" that the Gannaways claim are missing are not
necessary to define the nature and extent of the parties' obligations. The letters are clear and definite regarding the
agreement between the Gannaways and Pena. Therefore, the trial court did not err in determining that there was a contract,
and the contract satisfies the statute of frauds. The Gannaways' second issue is overruled.

D. Specific Performance

In their third issue, the Gannaways complain that the alleged agreement is neither specific nor complete enough to be
enforced by specific performance. Specifically, the Gannaways contend that Pena himself testified that he and Geoffrey
"did not discuss who would pay the taxes on the property, whether a survey was required, whether title insurance was
required, when the deed would be delivered, what security would be provided for the deferred payments, or what interest
rate would be charged."

Specific performance is an equitable remedy that rests in the discretion of the court. Scott v. Sebree, 986 S.W.2d 364, 370
(Tex. App.-Austin 1999, pet. denied). The purpose of specific performance is to compel a party who is violating a duty to
perform under a valid contract to comply with his obligations. Estate of Griffin v. Sumner, 604 S.W.2d 221, 225 (Tex. Civ.
App.-San Antonio 1980, writ ref'd n.r.e.). This equitable remedy is frequently granted when a valid contract to purchase
real property is breached by the seller. Id. (citing Kress v. Soules, 152 Tex. 595, 261 S.W.2d 703, 704 (Tex. 1953)).

A contract must be reasonably certain to be enforced by specific performance. Langley v. Norris, 141 Tex. 405, 173 S.W.2d
454, 457-58 (Tex. 1943); Condovest Corp. v. John Street Builders, Inc., 662 S.W.2d 138, 140 (Tex. App.-Austin 1983, no
writ). A written agreement for which a party sought specific performance "must contain the essential terms of a contract,
expressed with such certainty and clarity that it may be understood without recourse to parol evidence to show the intention
of the parties." Wilson v. Fisher, 144 Tex. 53, 188 S.W.2d 150, 152 (Tex. 1945).

We concluded in our discussion of the Gannaways' second issue that the contract between the Gannaways and Pena
contained the essential terms of a contract. Therefore, the trial court did not err in granting specific performance. The
Gannaways' third issue is overruled.

E. A Question of Fact

In their fourth issue, the Gannaways contend that whether the parties intended to be bound by the letters is a question of
fact for the jury. They argue that the evidence raises an issue of fact concerning whether Geoffrey and Pena intended to be
bound by the letters or whether they contemplated that a formal contract would be drafted and executed.

The Gannaways cite Scott v. Ingle Bros. Pacific, Inc., 489 S.W.2d 554 (Tex. 1972), for the proposition that whether the
parties intended to have created an enforceable contract is a question of fact and not a question of law and "the fact that
parties to negotiations contemplated the drawing and execution of a formal written contract is regarded in numerous cases
as evidence that they intended the prior . . . informal agreement . . . to be merely tentative and not final." Id. at 556.

The Gannaways assert that Geoffrey's testimony that he did not intend to be bound by the letters and that he believed that
Pena would have a formal contract drafted, coupled with the fact that Pena called him in January 1997 to inform him that
he had a contract ready for Geoffrey to sign, establishes that the agreement between Geoffrey and Pena was merely
tentative and not final. Therefore, they argue, the issue of the parties' intent to be bound should have been submitted to the
jury. We disagree.

The Scott court also stated: "Manifestations of assent that are in themselves sufficient to conclude a contract will not be
prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial
thereof; but the circumstances may show that the agreements are preliminary negotiations." Id. 

The court's charge did not ask the jury whether the parties intended the letters between Geoffrey and Pena to be a contract.
After reviewing these letters, we conclude that the intention of the parties was to create a contract, regardless of whether the
parties decided to draft a formal contract to restate their agreement. Accordingly, we hold that the trial court did not err in
(1) concluding that a contract had been created as a matter of law and (2) not submitting the issue to the jury. The
Gannaways' fourth issue is overruled. 

F. Exclusion of Evidence

In their fifth issue, the Gannaways complain the trial court erred in excluding evidence of a formal earnest money contract.
The Gannaways contend they did not tender the contract "for the purpose of proving the parties' true agreement or for the
purpose of having it enforced." Rather, they argue, "it was tendered: (1) to demonstrate that the parties both intended that
a formal contract was required to make their agreement binding; (2) to illustrate the deficiencies in the letters; and (3) to
support [their] version of the relevant events and to show the falsity of Pena's version."

The admission and exclusion of evidence is committed to the trial court's sound discretion. Gee v. Liberty Mut. Fire Ins.
Co., 765 S.W.2d 394, 396 (Tex. 1989). A trial court abuses its discretion when it acts without regard for any guiding rules
or principles. City of Brownsville v. Alvarado, 897 S.W.2d 750, 754 (Tex. 1995); Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241-42 (Tex. 1985). To obtain reversal of a judgment based on error in the admission or exclusion of
evidence, an appellant must show that the trial court did in fact commit error, and that the error probably caused the
rendition of an improper judgment. Tex. R. App. P. 44.1 (a)(1); McCraw v. Maris, 828 S.W.2d 756, 758 (Tex.
1992);Downan v. Tex. Gulf Shrimp Co., 846 S.W.2d 506, 512 (Tex. App.-Corpus Christi 1993, writ denied).

A formal earnest money contract was drafted by Jerry Canales, an attorney for Matias Pena, Jr., in January 1997, in
connection with the Gannaway/Pena proposed transaction. However, the contract was never signed. During the
Gannaways' direct examination of Canales and their attempt to offer the earnest money contract into evidence, the trial
court asked Canales: 

The Court: - is this draft - if you call it a draft or whatever it is - is that purported contract a signed contract?

Canales: No, sir.

The Court: Has it been executed?

Canales: No, Your Honor, it never has been.

The Court: Notarized?

Canales: It never has been, Your Honor. As a matter of fact, I'm not sure that in any detail that I ever even went over it
with Mr. Pena.

The Court: My next question, even though I know the answer to this one, just for the record, what legal significance, if
any, what legal responsibilities, if any, will arise between two consenting adults assuming you have a willing buyer and a
willing seller with regards to a written document which is not signed by either?

Canales: Absolutely nothing.

The Court: Thank you. The Court's ruling will remain.

The record establishes that the earnest money contract, while drafted by Pena's attorney, was never actually reviewed by
Pena or Gannaway, and that it was never signed by either party. Therefore, the draft contract is not binding and it does not
express the intentions of either party. We hold the trial court did not err in excluding the earnest money contract. The
Gannaways' fifth issue is overruled.

The judgment of the trial court is affirmed.


FEDERICO G. HINOJOSA

Justice



Do not publish. Tex. R. App. P. 47.3.



Opinion delivered and filed this the

21st day of March, 2002.

1. Retired Justice Melchor Chavez, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to
Tex. Gov't Code Ann. § 49.09(f) (Vernon 1998).

2. Geoffrey Gannaway, Lourie A. Gannaway, III, and John M. Gannaway are Juliana's grandsons. 

3. This will was found at the law offices of Stewart & Mann, but it was a copy of the original and was unsigned; the
original of this will was not found. Under this 1977 will, the property would pass to Juliana's three grandchildren, but it
would be held in trust. This will was not admitted to probate because of the presumption that the original will had been
revoked and destroyed.

4. Juliana's only other child, Azeale, died in 1922 at the age of 4.

5. At the time of Juliana's death in 1993, the land was appraised at $225,000.00.

6. Pena's offer was a little over $1,000.00 an acre. Geoffrey learned that an adjacent piece of property had recently sold for
$2,500.00 an acre.

7. Judge Homer Salinas retired on December 31, 1996.

8. The second assignment is identical except that it "is for the period beginning April 5, 1999, and ending April 30, 1999."